## De Haven *versus* Landell.

The title of a purchaser at sheriff's sale, under proceedings on a mortgage, relates back to the date of the mortgage.

If a plaintiff in ejectment claims title by twenty-one years' adverse possession, he must prove every element necessary to constitute a title under the Statute of Limitations; otherwise, it is the duty of the court to instruct the jury, that there is not sufficient evidence to entitle him to recover.

Error to the District Court of *Philadelphia*.

This was an ejectment by George Landell against George De Haven, for a triangular lot of ground, on the easterly side of Cherry street, in what was formerly the District of Kensington, but now the Eighteenth Ward of the City of Philadelphia. The *locus in quo* is marked *a*, *b*, *c*, in the following diagram:—

In 1730, Anthony Palmer acquired title in a tract of land, containing 191½ acres, situate in what was called by William Penn,

the Northern Liberties of the City of Philadelphia.    Palmer gave this tract the name of Kensington; it comprehended the whole of the former District of Kensington, north of Hanover street and east of the Frankford road.

On the 31st October 1746, Palmer conveyed to Timothy Scarth, in fee, a portion of this tract, containing 12 acres 108 perches.    And on the 28th April 1747, Scarth conveyed to John Durborrow, under whom both parties claimed, a small part of this lot, in form almost a parallelogram (for which see the foregoing diagram), and described as follows:—

"A certain lot or piece of ground situate in the Northern Liberties of the city of Philadelphia, *beginning at a post, a corner of Anthony Palmer's land; thence by Leonard Harmer's land, North 59° West, 320 feet to a corner stake; thence by John Reilley's lots North 30° East, 122 feet; thence along Mary street South 59° East, 329 foot; and thence along Cherry street South 35° West, 122 foot to the place of beginning.*"

At this time, Cherry street intersected Mary street at right angles, as laid down in the diagram.

On the 18th March 1748–9, John Durborrow mortgaged the premises, by the same precise description, to Matthew Drayson, to secure the payment of £50, with interest.    The mortgage was recorded on the 31st of the same month.

A *scire facias* was issued on this mortgage, out of the Court of Common Pleas for the county of Philadelphia, to September Term 1768, No. 161, wherein judgment was obtained in due course; and the mortgaged premises were sold by the sheriff under a *levari facias*, to George Seitz.    The sheriff's deed to Seitz is dated the 27th March 1770, and contains the same description of the premises as the deed from Scarth to Durborrow.    The defendant deduced a clear title from George Seitz, the purchaser at the sheriff's sale.

The plaintiff's paper title was as follows:—On the 29th August 1749, subsequently to the recording of the mortgage under which the defendant claims, Timothy Scarth conveyed to Isaac Norris a lot of 8 acres 70 perches (part of his large lot), one of the boundaries of which was Cherry street, described as running North 35° East.

Norris and Durborrow, both bounding on Cherry street, and being the owners of all the land bounding on it at that place, agreed to alter its course, so as to make it run straight from West street to Mary street, instead of making a right angle at their intersection.    And accordingly, Durborrow, by deed, dated the 6th September 1749, conveyed the triangular lot, which would thus be cut off by the change, to Norris.    This conveyance included the *locus in quo*, and under it the plaintiff made out his title.

[De Haven *v.* Landell.]

It was shown that the defendant had fenced in this lot in 1853; and some evidence was given, tending to show title in the plaintiff by twenty-one years' adverse possession. This is fully stated in the opinion of the court.

On the trial, before STROUD, J., the defendant's counsel requested the court to charge the jury—

1. That the paper title of the defendant is superior to that of the plaintiff.

2. That there is not sufficient evidence of the plaintiff's adverse possession to entitle him to recover.

3. That the verdict ought to be for the defendant, the plaintiff not having made out sufficient title to entitle him to recover.

The learned judge declined so to charge; there was a verdict, and judgment for the plaintiff below; whereupon the defendant removed the cause, and here assigned for error, the refusal of the court below to charge the jury as requested on the points presented.

*Junkin* and *E. K. Price*, for the plaintiff in error.—Both parties derived title under John Durborrow. The plaintiff, under his deed to Norris of the 6th September 1749; the defendant, under his mortgage to Dawson of the 18th March 1749. The mortgage was notice to subsequent purchasers: Burke *v.* Allen, 3 *Yeates* 351; Semple *v.* Burd, 7 *S. & R.* 292; Ebner *v.* Goundie, 5 *W. & S.* 49; Lightner *v.* Mooney, 10 *Watts* 407. And the sheriff's deed to Seitz carried back his title, by relation, to the date of the mortgage: McCall *v.* Lenox, 9 *S. & R.* 302; Gause *v.* Wiley, 4 *S. & R.* 509; McCormick *v.* McMurtrie, 4 *Watts* 195; Clarke *v.* Stanley, 10 *Barr* 472; Jaques *v.* Weeks, 7 *Watts* 270; Bury *v.* Sieber, 5 *Barr* 431; Coulter *v.* Philips, 8 *Harris* 154. And there can be no doubt, on the evidence, of the identity of the premises.

Fixed objects and adjoiners control courses and distances, and other uncertainty of description: Blasdell *v.* Bissell, 6 *Barr* 258; Large *v.* Penn, 6 *S. & R.* 448. And the legal title to uncultivated lands draws to it the possession: Miller *v.* Shaw, 7 *S. & R.* 134; Barr *v.* Gratz, 4 *Wheat.* 213; Mather *v.* Trinity Church, 3 *S. & R.* 513; Hole *v.* Rittenhouse, 1 *Casey* 492; Hawk *v.* Senseman, 6 *S. & R.* 21; Adams *v.* Robinson, 6 *Barr* 271.

The judge's refusal to charge that there was not sufficient evidence of the plaintiff's adverse possession to entitle him to recover, was an instruction to the jury that it was sufficient. The judge, therefore, pronounced, and instructed the jury that they were at liberty to infer and believe that Landell's possession had been "actual, visible, notorious, distinct, hostile, and continued for the period of twenty-one years," in the absence of any such proof.

[De Haven v. Landell.]

It was a question of boundary between two owners. "It is evident, that in a question of boundaries, evidence of possession does not apply with the same degree of force, as where the whole of a tract of land is held adversely against a claimant:" Gray v. McCreary, 4 *Yeates* 496.

The request was not objectionable as too general, or a taking the facts away from the jury, but taking the testimony on the part of the plaintiff below as true, that they did not make out a case for recovery in law: Weidler v. Farmers' Bank, 11 *S. & R.* 134, 141. If the evidence taken as true was insufficient to warrant the jury in finding for the plaintiff below, it would have been error to permit the jury to draw the inference that it was sufficient; which sufficiency was a question of law: Kelly v. Kauffman, 6 *Harris* 351.

If the request was too general, it was at least entitled to a modified answer: Amer v. Longstreth, 10 *Barr* 145. The refusal to give such answer was an assertion that the jury might take the evidence as sufficient.

*Hopper* and *G. M. Wharton*, for the defendant in error.—The judge's refusal to charge that the defendant's paper title was superior to that of the plaintiff, was right. The title of the defendant below, involving, as it did, questions of the locality of the lot in dispute, its metes, bounds, and distances, in connection with the description contained in the defendant's deeds and the mortgage under which he claimed, necessarily became a question for the jury: Collins v. Rush, 7 *S. & R.* 147; Naglee v. Ingersoll, 7 *Barr* 198.

The evidence as to the plaintiff's adverse possession was positive and conclusive.

This ejectment being brought to settle a disputed boundary, the possessory title of defendant in error, need not be of that strict character required of an intruder: Gray v. McCreary, 4 *Yeates* 496. It was not error, therefore, in the judge below to refuse to charge the jury as requested, and thus to take the point from them, and they found that the plaintiff had such adverse possession as to entitle him to recover.

The opinion of the court was delivered by

THOMPSON, J.—This was an action of ejectment brought by the defendant in error, who was plaintiff below, for the recovery of a small piece of ground situate on the easterly side of Cherry street, in the city of Philadelphia, in what was formerly known as the district of Kensington. The first assignment of error, on the record, is, "that the judge refused to charge that the paper title of the plaintiff in error, defendant below, is superior to that of

[De Haven *v.* Landell.]

the defendant in error and plaintiff below." Both parties derive title for the ground in question from John Durborrow. Landell, through Isaac Norris, to whom John Durborrow conveyed by deed, bearing date the 6th of September 1749, recorded the 3d of March 1784. This title was regularly vested in Landell, the plaintiff below. De Haven derived title under a mortgage from John Durborrow, dated March 18, 1749, to Matthew Drayson, and recorded the 31st of the same month, under which a sheriff's sale was made of the mortgaged premises to George Seitz, March 27, 1770, whose title was regularly vested in the defendant below. Thus standing, it will be seen that the title of the defendant is prior to that of the plaintiff, if covering the same ground, as the sale by the sheriff to Seitz, and carried his title, thus acquired, back to the date of the mortgage, by relation, and gave it priority to the deed from Durborrow to Norris of a later date: McCall *v.* Lenox, 9 *S. & R.* 302; McCormick *v.* McMurtrie, 4 *Watts* 195; Clarke *v.* Stanley, 10 *Barr* 472; Jaques *v.* Weeks, 7 *Watts* 270; Bury *v.* Sieber, 5 *Barr* 431; Coulter *v.* Philips, 8 *Harris* 154.

Does the deed of the premises to Seitz, under the sale on the mortgage, cover the ground conveyed by the deed of the 6th of September 1749, from Durborrow to Norris? Durborrow derived title to the premises he mortgaged from Timothy Scarth, by deed dated the 8th April 1749, which is described as "beginning at a post, a corner of A. Palmer's land, thence by Leonard Harmer's land N. 59° W., 320 feet to a stake, thence by John Reilly's lot, N. 30° E., 122 feet, thence along Mary street, S. 59° E. 329 feet, thence along Cherry street, S. 35° E., 122 feet, to the place of beginning," in form almost a parallelogram; two sides of which were bounded by Mary and Cherry streets; the course of Cherry street at the time being N. 34° E. That these were the courses of Mary and Cherry streets at that time is clearly shown by the deed of Timothy Scarth to Isaac Norris, dated 29th August 1749, conveying to the latter eight acres and seventy perches, bounding him westwardly and southerly by the same, in which the course of Cherry street is also stated to be N. 34° E.; varying but one degree from that mentioned in Scarth's deed to Durborrow; this may easily be accounted for by the difference in compasses, or the want of due arrangement of them, or the negligence of the surveyors. That the streets were so located, and that Cherry street departed from Mary street nearly at right angles at that time, is apparent from all the deeds in evidence, and thus they remained until the 6th of September 1749. On that day, John Durborrow conveyed to Isaac Norris a piece or parcel of the ground acquired by deed from Scarth, and in that conveyance the parties to it, being the owners of the land on both sides of Cherry and Mary streets, consented to, and altered, the course of Cherry street, declaring it to be N. 18° W., and

described the land conveyed by the former to the latter, as beginning at a corner of the said Isaac Norris's land by the side of a street called Cherry street, then along Cherry street as, now altered, and hereby confirmed, N. 18° W., crossing the end of Mary street, about 180 feet, to a corner, in the line of the said Isaac Norris's land, then continuing by the same S. 59° E., about 150 feet, to another corner in the said Isaac Norris's land, then by the same S. 34° W., 172 feet, to the beginning." This then clearly included that portion of Durborrow's lot lying eastwardly of new Cherry street, in the angle formed by new Cherry street, Mary street, and old Cherry street, and which was contained in and described in the mortgage to Drayson, and is the same parcel of ground conveyed by Sallie Norris Dickinson, and described as partly separated by Mary street from the eight acres and seventy perches which lay north of this street, (the property conveyed lying south of it) and which she further describes as being conveyed by John Durborrow to Isaac Norris, her grandfather. The north-western portion of this angle is the ground in controversy in this suit.

The hypothesis, that Durborrow's land lay westwardly of new Cherry street, is entirely without foundation, for at the date of his grant the change in Cherry street had not taken place, as the deed between him and Norris shows, and was not made until nearly six months afterwards. The argument also made, upon the description of his deed, that the point, if beginning, must be at the point of A. Palmer's and L. Harmer's land, is equally groundless; for, starting at that point, and running 320 feet west, the length granted, would carry the line into what was called Reilley's lot some distance. But if this did not happen, and the line from thence being extended across to Mary street, according to the courses in the deed, the distance from that point to the westwardly side of new Cherry street would be far short of 329 feet, the length to be taken on that line, and greatly more than that, if carried to old Cherry street. This demonstrates the fallacy of any argument derived from these suggestions. The courses of Mary street and of old Cherry street, as recognised by the deeds to Norris, and between Durborrow and Norris, fix boundaries that render the description of the property conveyed to Durborrow certain, and we think the court erred in not answering the plaintiff's first point in the affirmative. That the title of both parties covered the same land, and that the oldest must prevail.

The second error is to the refusal of the judge to charge as requested in defendant's third point, " that there was not sufficient evidence of the plaintiff's adverse possession to entitle him to recover."

A plaintiff in ejectment is always held to show title in himself, before he can invoke the aid of the court, to turn out his adversary,

[De Haven *v.* Landell.]

or divest him of the title possession confers. The title shown, must be such that the court can pronounce sufficient, if the jury believe it to be established by proof. It would be idle, if not something worse, to refer the sufficiency of title, as well as its existence, to the jury. To do so, would be to disregard essentials constituting it, as often as the preference of the jury might lean to the one side or the other. To avoid this evil, the constitutional provision for a judge, learned in the law, to instruct in such cases, was wisely provided.

Where a party relies on the statute of limitations, as giving him a positive title, one with which he can successfully assail even the holder of the legal title in possession, he ought to be held to show all the elements constituting it, conjoined and united in his hands; and that he, or those under whom he claims, entered into the possession of the premises, claiming the same as and for his own property, and that as such he has held actual, adverse, continued, visible, notorious, distinct, and hostile possession thereof, for the full period of twenty-one years: Hawk *v.* Senseman, 6 *S. & R.* 21; Adams *v.* Robinson, 6 *Barr* 271; Hole *v.* Rittenhouse, 1 *Casey* 493. A court should, in case of such a title, see that there is evidence to go to the jury on all these points. If it be wanting as to any of them, then an essential of title is wanting, and the duty of the judge is plain. He should instruct the jury that there is not sufficient evidence to entitle the plaintiff to recover.

In our case, the alleged adverse possession was neither evidenced by residence, or cultivation without residence, but by an use of the premises as pasture land. While we are willing to admit, that the disscisin may be effected, and an adverse possession maintained, by this means, of a town or city lot, still, as the use is of a less permanent and notorious nature, than when it is cultivated by raising crops or fruits upon it, and still less so than when it is made a place of habitation, it is, therefore, not too much to require, that there be no spark of dereliction of possession by the occupier while his title is ripening; that the fences be kept up at all times, as well during the season when not actually used for pasturage as when so occupied; Stephens *v.* Leach, 7 *Harris* 262; and, in addition, as evidence of continual claim, and as negativing any dereliction of possession, the payment of the taxes on the property. Thus, the fences would be notice to the owner of an adverse claim, while the assessment of taxes would inform him that the occupier was paying, not for the legal owner, but for himself; and this would be evidence of the nature of his claim.

Without taking into the account this last consideration, we think the testimony in the case, on the point of the statute of limitations was entirely deficient, and should have called from the court instructions to the jury to that effect. It by no means covered the requisites necessary to establish title under it. The only witness

[De Haven *v.* Landell.]

produced by the plaintiff in chief on this part of the case was John Landell, plaintiff's son. He testified that some time "in 1833, my father bought an interest in the lot. The next I knew, Mr. De Haven came to pay rent for it. About two years after, my father told him the rent would be raised. He said he would pay no more. My father then told him he must leave. However, De Haven did agree to pay more, and he remained and paid rent to my father for ten or twelve years—I think until 1846, or 1847. The whole lot was then enclosed in a board fence. In 1846, or 1847, De Haven left the lot entirely, and was out of possession about a year. We fenced the lot, and pastured horses in it. I never heard it pretended, that any one but George Landell owned any of this lot. The fences were again broken down, and George Landell enclosed the whole with a board fence. There was no triangular lot there then. It was all included in this lot. Mr. De Haven fenced in the triangular lot about two years ago. It was fenced up a second time, and a crop of grass cut off of it. The fence was kept up three years. The fence ran about three feet more into Cherry street than now. I never knew any one owned part of this lot before De Haven fenced in the triangular lot. He paid rent for this lot from 1833 to 1846." Cross-examined: "When I speak of the lot, I mean the whole lot. There was no triangular lot until Mr. De Haven fenced it in."

This was the evidence which defendant prayed the court to charge was insufficient to make out a title by the statute; for the rebutting testimony did in no manner contribute to aid it in any essential particular. Nor was the lease anything but a contract for, and not evidence of, actual possession. The witness does not describe the *locus in quo*, so as to show whether it was within the lot rented by De Haven or not; and if we guess that it was within the enclosure, he does not describe what the possession of De Haven was, or when taken, or how he occupied it. He says that De Haven was out of possession for about a year; but he does not say that anybody kept the possession in the mean time, or if kept, for whom it was kept during that period. He says, "We fenced the lot, and pastured horses in it." When this was done he does not say. Was it before De Haven left, or after? Was it the lot in controversy, or a larger one including it? All this is left in the dark, but was necessary to be proved. He says the fences were torn down, and twice put up. Did the ground lie open after the fences were torn down, and how long? That it was open for some space of time, and until rebuilt, may be taken for granted, and it was for the plaintiff to show how long that was, and that the fences were rebuilt so speedily after being torn down, that there was in fact no interruption of the occupancy; no dereliction of the possession. That the witness never heard of any claim to any part of the lot about which he was testifying, proved neither

[De Haven *v.* Landell.]

title nor possession in the plaintiff; and if it had been objected to, was not evidence for him.  Upon a careful consideration of the testimony, we have no hesitancy in saying, that being all taken as absolute verity, and we are considering it in no other light, it fell far short of making out title for the plaintiff, under the statute of limitations.

The third assignment of error, we also think, as the case stood before the jury, is sustained, and that the court should have instructed them as asked, "that the plaintiff had not made out a sufficient title to enable him to recover."  This remark applies to the case as it is now presented.  What may be made to appear on another trial, we neither anticipate, nor speculate upon.  For the reasons given, the judgment is reversed, and a *venire de novo* is awarded.